UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SUSANA ESQUIVEL DE-GIBER,

                Plaintiff,                CIVIL ACTION NO. 11-14407

           v.                       DISTRICT JUDGE DENISE PAGE HOOD

COMMISSIONER OF               MAGISTRATE JUDGE MARK A. RANDON
SOCIAL SECURITY,

                Defendant.
_____/

**REPORT AND RECOMMENDATION**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

Plaintiff Susana Esquivel De-Giber ("Plaintiff") brings this action challenging the
Commissioner of Social Security's ("Commissioner") final decision to deny her application for
Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Both parties
filed summary judgment motions (Dkts. 9, 12), which are before the Court for a Report and
Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) (Dkt. 2).  Plaintiff also filed a response
brief (Dkt. 13).

**I.**       **RECOMMENDATION**

For the reasons set forth below, this Magistrate Judge finds that the decision of the
Commissioner is supported by substantial evidence.  Accordingly, it is **RECOMMENDED** that
Plaintiff's motion for summary judgment be **DENIED**, that Defendant's motion for summary
judgment be **GRANTED** and that the findings and conclusions of the Commissioner be
**AFFIRMED**.

II.    **REPORT**

  *A. Administrative Proceedings*

  Plaintiff applied for benefits on January 29, 2010, alleging that she became unable to

work on September 23, 2008 (Tr. 16).  Plaintiff's application was initially denied by the

Commissioner on July 12, 2010 (Tr. 16).  Plaintiff requested a hearing and, on April 25, 2011,

Plaintiff appeared without counsel[1] before Administrative Law Judge ("ALJ") Oksana Xenos,

who considered the case *de novo*.  In a decision dated April 29 2011, the ALJ found that Plaintiff

was not disabled (Tr. 16-25).  Plaintiff requested a review of the ALJ's decision, which the

Appeals Council denied (Tr. 1, 11).  On October 6, 2011, Plaintiff filed this case, requesting

judicial review of the Commissioner's final decision (Dkt. 1).

  *B. ALJ Findings*

  Plaintiff was 40 years old on her alleged disability onset date (Tr. 23).  Plaintiff has

worked as a short order cook, warehouse worker and in retail sales; she has also taken

cosmetology courses (Tr. 23, 153).  The ALJ applied the five-step disability analysis to Plaintiff's

claim and found at step one that Plaintiff's previous work did not rise to the level of substantial

gainful activity (Tr. 18).  At step two, the ALJ found that Plaintiff had the following "severe"

impairments: "[a] history of carpal tunnel syndrome and release; rotator cuff tendinosis; diabetes;

and bipolar disorder."  *Id*.  At step three, the ALJ found no evidence that Plaintiff's combination

of impairments met or medically equaled one of the listings in the regulations.  *Id*.

---

  [1]  At the hearing, the ALJ informed Plaintiff that she had the right to be represented by an attorney or other qualified representative, and that she might be able to obtain free representation from a legal service organization (Tr. 33).  The ALJ offered to postpone the hearing to give Plaintiff time to find representation (Tr. 32).  Plaintiff answered that she understood her right to representation, and voluntarily choose to proceed with the hearing without representation (Tr. 33-34).

Between steps three and four, the ALJ found that Plaintiff had the Residual Functional

Capacity (RFC) to perform:

> [S]edentary work...except that [Plaintiff] requires unskilled, routine work with
> minimal contact with the general public, coworkers and supervisors. [Plaintiff]
> also requires work with minimal changes in the work setting. She can
> occasionally operate hand controls with the left (non-dominant) upper extremity
> and she can occasionally climb, balance, stoop, kneel, crouch, and crawl. She is
> able to frequently, but not constantly, perform activities requiring handling,
> fingering, or feeling. She can occasionally reach overhead with the left upper
> extremity, and she should avoid vibration (Tr. 20).

At step four, the ALJ found that Plaintiff could not perform her previous work as a short order

cook, warehouse worker, fast food worker, dining room hostess, cashier, grocery clerk or sales

clerk (Tr. 23). At step five, the ALJ denied Plaintiff benefits, because the ALJ found that

Plaintiff could perform a significant number of jobs available in the national economy, such as

clerical document preparer (4,000 jobs), bench assembler (2,000 jobs) or security monitor (2,000

jobs) (Tr. 24).

### C.    Administrative Record

#### 1.    Plaintiff's Testimony and Statements

At the hearing, Plaintiff testified that she had a sixth grade education (Tr. 39). She was

born in Mexico, and came to the United States twenty-seven years ago (Tr. 40). Plaintiff was

living with her college-aged son but, because of his work and school schedule, she is often home

alone (Tr. 40). Plaintiff said she last worked as a cashier in a grocery store in Detroit (Tr. 41).

She explained that she was disabled from working because "I can't deal with people and I like

people, but I just can't. I'm afraid to deal with people because I don't know when someone is

going to wrong [INAUDIBLE] me and I am going to be so upset and I cannot control myself"

(Tr. 42).

Plaintiff testified that she was "very violent" and that she was arrested for "beat (sic) some people up," but that she is now on medication which helps control her violent outbursts (Tr. 42). As for daily activities, Plaintiff stated that she reads a lot, writes letters to people, talks to her dogs and she loves to cook (Tr. 43). She also said that she enjoys painting flowers on the windows in her home as a hobby (Tr. 45). Plaintiff is a Jahovah's Witness; she attends weekly church meetings (Tr. 43).

Plaintiff's friend, Larry Hale, also testified at the hearing (Tr. 46). Mr. Hale testified that he helped Plaintiff and her family move to Michigan from El Paso (Tr. 47). He stated that Plaintiff found a job right away, but that she always lost her jobs or quit because she would "blow up" at her supervisors (Tr. 47-48).

### 2.    Medical Evidence

Plaintiff has been diabetic since the mid-1990's; she saw Sergio Rayer, M.D. for treatment of her diabetes (Tr. 204-206).

On May 31, 2006, Plaintiff received outpatient psychotherapy from Easter Seals for bipolar disorder, depression and impulse control disorder (Tr. 196-201). During this time-period, Plaintiff was assessed a Global Assessment of Functioning[2] ("GAF") score of 48 (Tr. 196). In a

---

[2]   The GAF score is "a subjective determination that represents the clinician's judgment of the individual's overall level of functioning. It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). A GAF score of 31-40 indicates some impairment in reality testing or communication (*e.g.*, speech is at times illogical, obscure, or irrelevant) or major impairment in several areas such as work or school, family relations, judgment, thinking or mood. A GAF of 41 to 50 means that the patient has serious symptoms . . . OR any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job). A GAF rating of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009). "A GAF score may help an ALJ assess mental RFC, but it is not raw medical data. Rather, it allows a mental health professional to turn medical signs and symptoms into a general assessment, understandable by a lay person, of an individual's mental functioning."

2:11-cv-14407-DPH-MAR   Doc # 14   Filed 10/24/12   Pg 5 of 21   Pg ID 473

letter dated January 29, 2007, Corina Lazar, M.D., from Easter Seals indicated that Plaintiff's

participation in psychotherapy resulted in her "making substantial progress" (Tr. 359). Dr. Lazar

also noted that Plaintiff was prescribed the following medications – Cymbalta, Effexor and

Risperdal (Tr. 359). Dr. Lazar stated that Plaintiff was "compliant with [her] medication

regimen, and has benefitted from pharmacotherapy (Tr. 359).[3]

On October 15, 2008, Plaintiff injured her shoulder while working in a CVS pharmacy

warehouse (Tr. 219). On that date, Plaintiff saw Cheryl Sulisz, M.D. (Tr. 219). Plaintiff

reported that she injured her right wrist two months prior, and was forced to use her left arm and

shoulder more to compensate (Tr. 219). As a result, Plaintiff injured her left shoulder, and

reported experiencing an 8 out of 10 level of pain in her shoulder, upper back and neck, with

tingling down her left arm to her left little finger and ring finger (Tr. 219). Plaintiff stated that

her shoulder injury made it hard to sleep at night (Tr. 219). She had been self-medicating with

"pain relief pills with caffeine in them from Mexico," but they only provided minimal relief (Tr.

219). X-rays of Plaintiff's shoulders were negative, and Plaintiff was diagnosed with a trapezius

strain, cervical radiculopathy, cervial strain and shoulder strain (Tr. 220). Plaintiff was

prescribed 800 mg of Ibuprofen and 10 mg of Cyclobenzaprine.[4] She was also advised to stop

taking over the counter medication, directed to attend physical therapy 3 to 5 times per week, and

instructed to avoid: lifting objects weighing more than 10 pounds, pushing or pulling over 5

---

*Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x. 496, 502 fn. 7 (6th Cir. 2006).

[3] On March 25, 2011, Plaintiff sought counseling at Southwest Counseling Solutions and
it was noted that Plaintiff was experiencing mood swings, extreme PMS, racing thoughts and
restlessness (Tr. 356). However, it was also noted that Plaintiff was "[n]ot taking her medication
or seeing her psychiatrist as scheduled" (Tr. 356).

[4] A muscle relaxant. *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000699/
(last visited October 18, 2012).

-5-

pounds of force, reaching above her shoulders, climbing and more than limited use of her left arm (Tr. 220-221).

On October 20, 2008, Plaintiff saw David Pommarening, M.D. for a follow-up appointment for her shoulder injury (Tr. 214). Plaintiff stated that her pain level was 6/10, and that her pain is exacerbated by movement or lifting (Tr. 214). Dr. Pommarening noted that "Plaintiff has not been working because she chose (sic) not to work" (Tr. 214). Plaintiff was diagnosed with muscular shoulder pain and instructed to continue her prescription medications (Tr. 215). Plaintiff was also instructed to ice her shoulder for 10 to 15 minutes per hour (Tr. 215).

On October 27, 2008, Plaintiff returned for a re-check of her shoulder injury (Tr. 212). Plaintiff was examined by William Rogers, P.A. (Tr. 212). Plaintiff stated that she had been taking her prescription medications, with no improvement (Tr. 212). She described her pain as "severe and sharp" and 10/10 (Tr. 212). Plaintiff was again diagnosed with a shoulder strain, and instructed to continue taking her current medications (Tr. 213).

On November 12, 2008, Plaintiff saw Ramsey Shehab, M.D. for continuing shoulder pain (Tr. 266). An ultrasound indicated tendinitis and a partial tear to the supraspinatus tendon (Tr. 266). Plaintiff was referred to physical therapy, prescribed naproxen, and directed to follow-up with Dr. Shehab after completing physical therapy (Tr. 266). Plaintiff attended 11 out of 15 physical therapy sessions (Tr. 222). She was "discharged from therapy secondary to not being able to keep with therapy appointments" (Tr. 222).

On November 24, 2008, Plaintiff was seen by Dr. Trevor Banka for right carpal tunnel syndrome (Tr. 264). Plaintiff reported numbness in her right hand as well as tingling of her index, middle and ring fingers (Tr. 264). Plaintiff had a positive carpal tunnel compression test,

although nerve conduction tests were normal (Tr. 264). Plaintiff reported that she had not been able to work for four weeks (Tr. 264). Dr. Banka recommended that Plaintiff undergo surgery, specifically, carpal tunnel release and trigger finger release surgery (Tr. 264).

On December 3, 2008, Plaintiff underwent carpal tunnel surgery (Tr. 279). On December 15, 2008, Plaintiff was seen by Dr. Ephraim Zinberg as a follow-up to her surgery. Dr. Zinberg noted that Plaintiff's wounds were well healed and she had a full range of flexion of her "PIP joints," but observed "slight flexion contractures" of her index and middle fingers (Tr. 279). Dr. Zinberg instructed Plaintiff to continue hand therapy, avoid heavy lifting until February 1, 2009, at which time "she may return to work with no restrictions" (Tr. 279).

March 20, 2009 notes from Plaintiff's physical therapy indicate that Plaintiff achieved a full range of motion in her left shoulder, and that her shoulder strength was "minimally off" (Tr. 225). Plaintiff was described as "moderately" impaired with respect to lifting and carrying and "severely" impaired with respect to overhead reaching (Tr. 225). Plaintiff attended 19 out of 22 physical therapy sessions for her right-hand carpal tunnel syndrome (Tr. 223). She made excellent progress according to her therapist, and was able to perform mopping and sweeping on her own as well as attain greater independence in doing her other daily activities (Tr. 227, 229).

On May 4, 2009, Plaintiff reported being "much improved" since her carpal tunnel surgery (Tr. 274). Plaintiff reported having some trouble lifting heavy objects, but stated that she could perform all of her household chores (Tr. 274). Plaintiff was given a "return to work note," that stated she should not lift objects greater than 5 pounds with her right hand, and avoid repetitive motion (Tr. 274).

On August 13, 2009, Plaintiff returned to Dr. Shehab for a follow-up appointment relating to her left-shoulder pain (Tr. 272). Plaintiff described her pain levels as 6 or 7, and Dr.

Shehab discussed the possibility of a steroid injection to alleviate her pain (Tr. 272).  Plaintiff

reported that she was unemployed, but that she was "starting to look for a new job" (Tr. 272).

Dr. Shehab did give Plaintiff a steroid injection, and Plaintiff reported that it "helped

significantly" (Tr. 268).  In particular, following the injection, Plaintiff reported that her pain

level dropped to 0 or 1 on a 10 point scale (Tr. 268).  Dr. Shehab gave Plaintiff a note to

"increase her workload over the next 6 weeks" (Tr. 268).

On September 9, 2009, Plaintiff was seen by Aamir Siddiqui, M.D. for a second opinion

concerning her carpal tunnel condition.  Dr. Siddiqui noted that Plaintiff still experienced

weakness and pain in her right wrist (Tr. 269).  Dr. Siddiqui noted that Plaintiff was working as a

cashier at the time (Tr. 269).  On examination, Plaintiff exhibited a full range of motion in her

right wrist and a grip strength of 20-30 pounds in her right hand and 50-55 pounds in her left

hand (Tr. 270).

On April 27, 2010, Plaintiff saw a plastic surgeon – David Hing, M.D. – for an

independent medical examination at the request of Plaintiff's attorney.  Dr. Hing indicated that

he was restricting his evaluation to Plaintiff's wrist, since he was "not a shoulder specialist" (Tr.

295).  During this examination, Plaintiff complained of painful movement in her right index

finger (Tr. 296).  Dr. Hing opined that Plaintiff developed traumatic tendinitis following a hyper

extension of her wrist on September 2, 2008 (Tr. 297).  Dr. Hing recommended that Plaintiff

avoid right hand repetitive grasping or use of pistol grip power tools (Tr. 298).  Dr. Hing further

restricted Plaintiff to lifting 2-4 pounds (Tr. 298).

On June 3, 2010, State Agency psychiatrist Luzbella Imasa, M.D., examined Plaintiff and

completed a report (Tr. 299-301).  Dr. Imasa noted that Plaintiff complained of trouble sleeping,

racing thoughts and crying spells (Tr. 299).  Dr. Imasa indicated that Plaintiff was taking Prozac,

and that she used to see a psychiatrist but had to stop due to a lack of health insurance (Tr. 301).

Dr. Imasa concluded that Plaintiff suffered from bipolar disorder, depressed type, and assessed

Plaintiff a GAF score of 50 (Tr. 301).

On July 9, 2010, Jerry Csokasy, Ph.D. filled out a Mental Residual Functional Capacity

Assessment form on which he indicated that Plaintiff was "moderately" restricted in her ability to

maintain attention and concentration for extended periods (Tr. 326). However, Dr. Csokasy also

stated that Plaintiff was "able to perform simple/routine tasks on a sustained basis" (Tr. 328).

### 3.   Vocational Expert

At the administrative hearing, the ALJ asked a Vocational Expert (VE) to hypothesize

whether any jobs existed for an individual of Plaintiff's age, education, and previous work

experience, who was limited to performing a range of sedentary work, that involved only

occasional operation of hand controls with the left, nondominant upper extremity, occasional

climbing, balancing, stooping, kneeling, crouching, and crawling, and occasional reaching

overhead with the left upper extremity (Tr. 49). Additionally, the ALJ's hypothetical question

assumed the individual could tolerate frequent but not constant activities that required handling,

fingering, or feeling, and avoidance of vibration (Tr. 49). Further, the work had to be unskilled

and routine in nature, and involve minimal contact with the general public, co-workers, and

supervisors, as well as minimal changes in the work setting (Tr. 49).

The VE responded that there would be unskilled, sedentary jobs in the regional economy

that this individual could perform, such as clerical handling jobs (4,000 jobs in Southeast

Michigan), bench hand (2,000 jobs) or security monitor (2,000 jobs) (Tr. 50).

### D.    Plaintiff's Claims of Error

Plaintiff asserts that the ALJ committed three errors in concluding that she was not disabled.  First, Plaintiff claims that the ALJ incorrectly assessed her bipolar disorder and, more particularly, failed to appropriately develop the record concerning Plaintiff's failure to seek out and comply with mental health treatment.  Second, Plaintiff claims that the ALJ's hypothetical question to the VE improperly excluded a limitation to account for Plaintiff's "moderate" restrictions in concentration, persistence or pace.  Finally, Plaintiff claims that the ALJ erred in giving Dr. Hing's (an independent medical examiner) opinion "great weight," but not adopting the 2-4 pound lifting restrictions found by Dr. Hing.

## III.    DISCUSSION

### A.    Framework for Disability Determinations

Under the Social Security Act (the "Act") Disability Insurance Benefits and Supplemental Security Income are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### B.     *Standard of Review*

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited such that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." (internal quotation marks omitted)). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

-11-

*Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted); *see also Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted) (explaining that if the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, this Court is limited to an examination of the record and must consider that record as a whole.  *See Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535. There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record.  *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." (internal quotation marks omitted)). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

### C.    *Analysis*

As noted earlier, Plaintiff raises three arguments on appeal; each argument is considered below:

### 1. Bipolar Disorder

Plaintiff's first argument is that the ALJ incorrectly assessed Plaintiff's bipolar disorder and failed to adequately develop the record concerning Plaintiff's failure to comply with mental health treatment. Plaintiff points to her GAF scores of 48 (from Easter Seals in 2006; Tr. 196) and 50 (from the state psychologist in 2010; Tr. 301) as evidence that Plaintiff's bipolar disorder was of greater severity than the ALJ recognized. However, GAF scores are a subjective rather than an objective assessment and, as such, were not entitled to any particular weight. *See Kornecky v. Comm'r of Soc. Sec*, 167 Fed. App'x 496, 511 (6th Cir. 2006). "GAF examinations measure psychological, social, and occupational functioning on a continuum of mental-health status from 0 to 100, with lower scores indicating more severe mental limitations." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009). "GAF is a clinician's subjective rating of an individual's overall psychological functioning. A GAF score may help an ALJ assess mental RFC, but it is not raw medical data. Rather, it allows a mental health professional to turn medical signs and symptoms into a general assessment, understandable by a lay person, of an individual's mental functioning." Furthermore, the Commissioner "has declined to endorse the [GAF] score for use in the Social Security and SSI disability programs, and has indicated that [GAF] scores have no direct correlation to the severity requirements of the mental disorders listings." *DeBoard v. Comm'r of Soc. Sec.*, 211 Fed. App'x. 411 (6th Cir. 2006) (internal quotations omitted; also, affirming ALJ's decision denying benefits where treating physician assessed the plaintiff a GAF score of 50).

The evidence in this case concerning Plaintiff's bipolar disorder is relatively sparse. Plaintiff received some treatment from Easter Seals in 2006 and, in fact, a January 2007 letter from a psychologist at Easter Seals noted that Plaintiff's participation in psychotherapy and her

-13-

use of prescription medications "has resulted in [Plaintiff] making substantial progress" (Tr.

359). The ALJ reasonably concluded that Plaintiff was stable when she was compliant with

mental health treatment, and this Magistrate Judge finds no basis to disturb the Commissioner's

conclusions, as they are supported by substantial evidence.

Plaintiff also cites SSR 82-59, and argues that the ALJ erred by not developing the record

more fully as to why Plaintiff was non-compliant with her mental health treatment. As to

non-compliance, SSR 82-59[5] provides that:

> [a]n individual who would otherwise be found to be under a disability, but who
> fails without justifiable cause to follow treatment prescribed by a treating source
> which the Social Security Administration (SSA) determines can be expected to
> restore the individual's ability to work, cannot by virtue of such 'failure' be found
> to be under a disability.

SSR 82–59. The ruling also provides examples of justifiable cause, including the inability to

afford treatment and a lack of free community resources. *Id.* However, any requisite procedures

under SSR 82–59 only *apply* after an ALJ finds that the claimant would otherwise be disabled.

Here, "[b]ecause the ALJ concluded that [Plaintiff] was not disabled, SSR 82–59 is

inapplicable." *Lockwood v. Comm'r Soc. Sec.*, 397 Fed. App'x 288, 290 (9th Cir. 2010); *see also*

*Thompson v. Comm'r of Social Sec.*, Case No. 11-10234, 2012 WL 1340443 *18 (E.D. Mich.

March 15, 2012).

### 2. Concentration, Persistence and Pace

Plaintiff next argues that the ALJ's hypothetical was inaccurate because it failed to

explicitly recognize that Plaintiff was "moderately" limited in concentration, persistence and

pace**.** The ALJ posed the following hypothetical question to the VE:

---

[5] *See* http://www.socialsecurity.gov/OP_Home/rulings/di/02/SSR82-59-di-02.html

> Q.  Please assume an individual of [Plaintiff's] age and the alleged onset date
> which was 40, 6th grade education and past work experience who can perform
> work at the light level but is limited to unskilled, routine work with minimal
> contact with the general public, co-workers and supervisors, minimal changes in
> the work setting, can occasional (sic) operate hand controls with her left, non-
> dominant upper extremity; can occasionally climb, balance, stoop, kneel, crouch,
> and crawl; can frequently but not constantly perform activities requiring handling,
> fingering, or feeling and can occasionally reach over head with her left upper
> extremity and should also avoid vibration (Tr. 49).[6]

"In order for a vocational expert's testimony in response to a hypothetical question to serve as

substantial evidence in support of the conclusion that a claimant can perform other work, the

question must accurately portray a claimant's physical and mental impairments." *Ealy v. Comm'r

of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010).  Plaintiff's argument  – that hypothetical

limitations such as "simple," and "unskilled" fail to account for moderate mental deficiencies – is

not uncommon and the case law in this District resolves it both ways.  Indeed, there is relevant

authority ordering remand where an ALJ's hypothetical does not include a specific reference to

moderate limitations in concentration or pace and only limits the hypothetical individual to

unskilled work or simple, routine tasks.[7]   However, there is also authority that has found an ALJ

---

[6]  The ALJ later revised the hypothetical to include the same limitations, but for sedentary
work only (Tr. 50).

[7]  *See e.g., Benton v. Comm'r of Soc. Sec.*, 511 F.Supp.2d 842, 849 (E.D. Mich. 2007)
("Here, the ALJ found that although Plaintiff has a moderate deficiency in her ability to maintain
concentration, persistence, and pace, she is able to perform simple, routine, repetitive work.
However, the limitations included in the hypothetical question and the VE's testimony regarding
the effect a lack of concentration has on the jobs mentioned was insufficient to suitably
accommodate Plaintiff's concentration limitations."); *Green v. Comm'r of Soc. Sec.*, No.
08–11398, 2009 WL 2365557, at *10 (E.D. Mich. July 28, 2009) ("In the present case, while
finding that Plaintiff is 'moderately limited with concentration, persistence, and pace,' [the
ALJ's] only limitations were with co-workers and the public, and to "unskilled, light jobs."
These parameters are not sufficient, and do not fully convey Plaintiff's limitations in
concentration to the VE. Plaintiff may be unable to meet quotas, stay alert, or work at a
consistent pace, even at an unskilled job." (internal citations omitted)); *Long v. Comm'r of Soc.
Sec.*, No. 09–14227, 2010 WL 6413317, at *7 (E.D. Mich. Dec. 6, 2010) ("In the present case,
the ALJ gave Plaintiff the mental limitation for 'simple unskilled work.' However, the ALJ also

formed an accurate hypothetical by limiting the claimant to unskilled work and omitting a moderate concentration or pace limitation.[8]  In analyzing the case law, this Magistrate Judge agrees that a hypothetical simply limiting a claimant to unskilled work may, in some instances, fail to capture a claimant's moderate limitation in concentration, persistence, or pace because the difficulty of a task does not always equate with the difficulty of staying on task.  *See e.g., Green v. Comm'r of Soc. Sec.*, No. 08–11398, 2009 WL 2365557, at * 10 (E.D. Mich. July 28, 2009) ("It is difficult to reasonably accept 'moderate' meaning anything less than 20%–30% of the time at work. Thus, 'moderate' concentration problems ... need to be included or accommodated in some suitable fashion in the hypothetical question at Step 5 of that sequence.  Simply including the hypothetical of unskilled jobs with limited contact with co-workers and the public is not sufficient"); *Edwards v. Barnhart*, 383 F.Supp.2d 920, 930 (E.D. Mich. 2005) ("Plaintiff may be

_____

determined that 'with regard to concentration, persistence or pace, [Plaintiff] has moderate difficulties.' The ALJ did not incorporate [that] limitation ... into the controlling hypothetical. This was error." (internal citations omitted)); *Perkins v. Comm'r of Soc. Sec.*, No. 10–10089, 2010 WL 5634379, at *9 (E.D. Mich. Dec. 14, 2010) (same).

   [8]  *See e.g., Hess v. Comm'r of Soc. Sec.*, No. 07–13138, 2008 WL 2478325, at *7–8 (E.D. Mich. June 16, 2008) ("Taken in isolation, the hypothetical limitations consisting of '[s]imple routine tasks in a low stress environment' and 'minimal changes in the work place setting' might appear inadequate to account for 'moderate' concentrational and pacing deficiencies. However, the record as a whole indicates that the hypothetical question and the ALJ's finding of 'moderate' limitations ... are not incompatible ."); *Latare v. Comm'r of Soc. Sec.*, No. 08–13022, 2009 WL 1044836, at *3 (E.D. Mich. April 20, 2009) ("The Law Judge's hypothetical questions to the Vocational Expert accurately described Plaintiff's moderate limitations caused by her depressive disorder. There is no merit to Plaintiff's argument that the ALJ should have included a limitation that she had moderate limitations in maintaining concentration, persistence or pace. Unskilled work, by definition, is limited to understanding, remembering and carrying out only simple instructions and requiring little, if any, judgment."); *Lewicki v. Comm'r of Soc. Sec.*, No. 09–11844, 2010 WL 3905375, at *3 (E.D. Mich. Sept. 30, 2010) ("There may be cases where such moderate limitations preclude the performance of even some simple, unskilled tasks. Plaintiff does not, however, explain why the facts of this particular case require a more detailed hypothetical question to adequately account for his own moderate limitations in concentration, persistence, or pace.").

-16-

unable to meet quotas, stay alert, or work at a consistent pace, even at a simple, unskilled, routine job").

However, there is no bright-line rule requiring remand whenever an ALJ's hypothetical includes a limitation of "unskilled, routine work" but excludes a moderate limitation in concentration. Rather, this Court must look at the record as a whole and determine if substantial evidence supports the ALJ's RFC. *See Hess v. Comm'r of Soc. Sec.*, No. 07–13138, 2008 WL 2478325, at *7 (E.D. Mich. June 16, 2008); *see also Lewicki v. Comm'r of Soc. Sec.*, No. 09–11844, 2010 WL 3905375, at *3 (E.D. Mich. Sept. 30, 2010) ("There may be cases where such moderate limitations preclude the performance of even some simple, unskilled tasks. Plaintiff does not, however, explain why the facts of this particular case require a more detailed hypothetical question to adequately account for his own moderate limitations in concentration, persistence, or pace"). In a similar case, this evaluative process was explained as follows:

> Taken in isolation, the hypothetical limitations consisting of '[s]imple routine tasks in a low stress environment' and 'minimal changes in the work place setting' might appear inadequate to account for 'moderate' concentrational and pacing deficiencies. However, the record as a whole indicates that the hypothetical question and the ALJ's finding of "moderate" limitations findings are not incompatible.

*Hess v. Comm'r of Soc. Sec.*, No. 07–13138, 2008 WL 2478325, at *7 (E.D. Mich. June 16, 2008); *see also Lewicki v. Comm'r of Soc. Sec.*, No. 09–11844, 2010 WL 3905375, at *3 (E.D. Mich. Sept. 30, 2010).

In *Hess*, the state agency doctor found that the claimant suffered moderate limitations in concentration, persistence, and pace, such that the claimant had limitations in performing at a consistent pace. *See Hess*, 2008 WL 2478325, at *7. However, the doctor ultimately concluded that the claimant retained the ability to perform unskilled tasks on a sustained basis. *Id.* at *4. *Hess* concluded that because the ALJ relied on the state doctor's finding of a moderate

-17-

impairment with concentration, persistence or pace, it was reasonable for the ALJ to also rely on that doctor's ultimate conclusion that the claimant could perform unskilled work on a sustained basis, and, accordingly, to omit a concentration-based limitation from the hypothetical. *Id.* at *8.

In this case, the ALJ's limitation of unskilled, routine work accurately reflects Dr. Csokasy's opinion that Plaintiff was "moderately" limited with respect to concentration, persistence and pace. On the same forms in which he indicated that Plaintiff had moderate limitations with regard to concentration, persistence and pace, Dr. Csokasy also concluded that Plaintiff was "able to perform simple/routine tasks on a sustained basis" (Tr. 328). This conclusion is not significantly different from the hypothetical question presented by the ALJ, which limited Plaintiff to "unskilled, routine work" (Tr. 20). As in *Hess* and *Lewicki*, this Court believes that the ALJ's finding of a moderate limitation in concentration, persistence, or pace has to be considered in conjunction with Dr. Csokasy's broader conclusion, which suggests that Plaintiff could successfully perform unskilled occupational tasks. As such, the hypothetical question used by the ALJ is supported by substantial evidence in the record and should not be disturbed on appeal.

### 3. Dr. Hing

Finally, Plaintiff argues that the ALJ erred in giving Dr. Hing's opinion "great weight" (Tr. 23), but not adopting Dr. Hing's finding that Plaintiff was limited to lifting no more than 2-4 pounds. Specifically, the ALJ found:

> David Hing, M.D., an independent medical examiner, determined that [Plaintiff] must avoid right hand repetitive grasping with pinching or use of pistol grip power tools. Dr. Hing also restricted [Plaintiff] to lifting no more than 2 - 4 pounds. This opinion is generally given great weight because it is based on examination of [Plaintiff] and is consistent with [Plaintiff's] longitudinal treatment record. However, Dr. Hing's finding that [Plaintiff] is restricted to lifting no more than 2 - 4 pounds is not substantiated by the remainder of the record and, instead, the undersigned finds that [Plaintiff] can lift up to 10 pounds,

-18-

as reported by [Plaintiff] in the treatment records (Tr. 23) (internal citation omitted).

Contrary to Plaintiff's argument, substantial evidence supports this finding.  The ALJ found that, after 2008 carpal tunnel and trigger finger release surgery, Plaintiff had a 60% improvement of her symptoms, increased her strength, and could make a fist as well as sweep and mop around the house (Tr. 21, 223, 227).  The ALJ also correctly noted that a November 2009 nerve conduction study showed no abnormalities (Tr. 21, 294).  Furthermore, at an examination in November 2009, Plaintiff exhibited a full range of motion and had a grip strength of 30 pounds in her right hand (Tr. 271).  While grip strength alone might not normally indicate with how much weight an individual can lift, Plaintiff's grip strength is germane to the ALJ's consideration of Dr. Hing's opinion because Dr. Hing explicitly indicated that, since he was "not a shoulder specialist," he was restricting his evaluation to Plaintiff's wrist (Tr. 295).  In other words, substantial evidence supports the ALJ's conclusion that Plaintiff experienced improvement in her right-hand carpal tunnel syndrome following surgery, and the ALJ was entitled to reject Dr. Hing's 2-4 pound lifting restriction as not supported by the record, while still giving Dr. Hing's overall opinion "great weight."

The deferential standard of review in this Court presupposes that there is a "zone of choice" within which the ALJ may make a decision without being reversed.  *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir.1994).  Thus, if the Commissioner's decision is supported by substantial evidence, it must stand, regardless of whether the Court would resolve the disputed facts differently.  *See Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir.1993).  After review of the record, this Magistrate Judge concludes that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "zone of choice within which decision

makers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035, as the decision is supported by substantial evidence.

III.     **CONCLUSION**

Based on the foregoing, it is **RECOMMENDED** that Plaintiff's motion for summary judgment be **DENIED**, that Defendant's motion for summary judgment be **GRANTED** and that the findings and conclusions of the Commissioner be **AFFIRMED**.

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1).  Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation.  *See McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this Magistrate Judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response.  *See* E.D. Mich. LR 72.1(d)(3), (4).

s/Mark A. Randon
Mark A. Randon
United States Magistrate Judge

Dated:  October 24, 2012

<u>Certificate of Service</u>

I hereby certify that a copy of the foregoing document was mailed to the parties of record on this date, October 24, 2012, by electronic and/or ordinary mail.

s/Melody Miles
Case Manager